JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
**ROBERT B. FIRPO, CALIFORNIA STATE BAR NO. 243991**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
1290 W. MYRTLE STREET, SUITE 500
BOISE, ID 83702
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-9375
Email: Robert.Firpo@usdoj.gov

Attorneys for Plaintiff United States

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BIRD TIRE AND AUTO CORPORATION and KRIS BIRD,<br><br>Defendants. | Case No._____<br><br>**COMPLAINT** |

Plaintiff United States of America (United States) alleges as follows:

**I.    INTRODUCTION**

1.    This is an action by the United States against Defendants Bird Tire and Auto Corporation (Bird Tire) and Kris Bird (collectively, Defendants) for treble damages and civil penalties for violations of the False Claims Act (FCA), as amended, 31 U.S.C. §§ 3729-3733; civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA); and damages and other monetary relief under the common law and equitable theories of fraud, unjust enrichment, and payment by mistake.

2.      To secure the best deal for taxpayers—and to promote free and fair competition—the U.S. Forest Service (USFS) advertises and runs a bidding process to award certain firefighting-related contracts to qualified small businesses.  Under these contracts, vendors supply fuel trucks, water trucks, communication trailers and many other goods and services to assist federal land managers in efforts to fight wildfires.  The USFS awards contracts to vendors based on the service they provide in a location and at a price determined during the bidding process.  Then, when wildfires arise, state and federal agencies—including the USFS, Bureau of Land Management (BLM), National Park Service (NPS), and U.S. Fish and Wildlife Service (USFWS)—rely on those contracts to order and dispatch equipment on short notice.

3.      Defendants, in coordination with other individuals and entities, including Ike Tomlinson, Kaden Tomlinson, Jake Tanner, Mud Lake Oil, Inc. (Mud Lake Oil), and Fuel Source, LLC (Fuel Source), violated the FCA by fraudulently obtaining firefighting-related government contracts through a bid rigging and territorial allocation conspiracy and then presenting claims to the government under those fraudulently obtained contracts.

4.      The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) provided emergency financial assistance to millions of Americans suffering economic effects caused by the COVID-19 pandemic.  One form of financial assistance provided by the CARES Act was forgivable loans to small businesses through a program referred to as the Paycheck Protection Program (PPP).

5.      Defendants Bird Tire and Kris Bird violated the FCA and FIRREA by making false statements to fraudulently obtain a PPP loan.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3729, 3730(a), and 3732.

7.    This Court has personal jurisdiction over the Defendants because they resided in the District of Idaho, transacted business in the District of Idaho, and engaged in wrongdoing in the District of Idaho.

8.    Venue is proper in the District of Idaho because (a) Defendants reside and conduct business within the District of Idaho, (b) a substantial portion of the events giving rise to the action occurred in the District of Idaho, and (c) the civil penalties sought by the United States accrued in the District of Idaho.  *See* 28 U.S.C. § 1391(b); 28 U.S.C. § 1395(a); 31 U.S.C. § 3732.

9.    Pursuant to United States District Court for the District of Idaho Local Civil Rule 3.1, venue is proper in the District of Idaho's Southern Division.

## III.    THE PARTIES

10.    Plaintiff United States, acting through the USFS, contracts for goods and services. Plaintiff United States, acting through the SBA, administers the PPP Loan Program.

11.    Defendant Bird Tire is an Idaho corporation with its principal place of business in Salmon, Idaho.  Bird Tire successfully bid on and was awarded federal contracts to provide fuel trucks to dispatch centers in Idaho, Nevada, and elsewhere. Bird Tire competed against other entities for fuel truck contracts, including Mud Lake Oil and Fuel Source.

12.    Defendant Kris Bird is a resident of Idaho and is the owner, President, and Chief Executive Officer (CEO) of Bird Tire.

## IV.    OTHER RELEVANT ENTITIES AND INDIVIDUALS

13.    Mud Lake Oil is an Idaho corporation with its principal place of business in Terreton, Idaho.  Mud Lake Oil successfully bid on and was awarded federal contracts to provide fuel trucks to dispatch centers in Idaho and elsewhere.  Mud Lake Oil competed against Bird Tire for federal contracts.

14.    Fuel Source is an Idaho corporation with its principal place of business in Terreton, Idaho.  Fuel Source successfully bid on and was awarded federal contracts to provide fuel trucks to dispatch centers in Idaho, Nevada, California, Montana, and elsewhere.  Fuel Source competed against Bird Tire for federal contracts.

15.    Defendant Ike Tomlinson is a resident of Idaho and a former owner and President of Mud Lake Oil and Fuel Source.  In October 2020, Ike Tomlinson and his wife sold Mud Lake Oil and Fuel Source to Kaden Tomlinson and Jake Tanner.  After the sale, Ike Tomlinson remained involved in the operation and management of Mud Lake Oil and Fuel Source.  Kaden Tomlinson and Jake Tanner also played active roles in the operation and management of those entities.

## V.    THE LAW

### A.    The False Claims Act

16.    The FCA is the United States' primary litigation tool against fraud perpetrated by those who wrongfully obtain monies from federally-funded contracts, projects, and programs. Consistent with the congressional purpose underlying the FCA, the Supreme Court has noted that the FCA must be interpreted broadly so as to apply to all those who receive government monies to which they are not entitled.  *See United States v. Niefert-White Co.*, 390 U.S. 228, 232 (1968).

17.    The FCA provides that a person is liable to the United States for three times the amount of damages the United States sustains because of the acts of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

18.    The FCA also provides that a person is liable to the United States for three times the amount of damages that the United States sustains because of the acts of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."
31 U.S.C. § 3729(a)(1)(B).

19.    The FCA also creates liability for any person who "conspires" to violate the FCA.  *See* 31 U.S.C. § 3729(a)(1)(C).

20.    Under the FCA, the term "claim" includes requests to the United States for payment, whether made directly or indirectly to the United States.  31 U.S.C. § 3729(b)(2)(A).

21.    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729(b)(4).

22.    The FCA defines "knowing" and "knowingly" as having actual knowledge that the information is false, or acting with a deliberate ignorance of, or reckless disregard for, the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  The FCA does not require proof of specific intent to defraud.  *Id.*

23.    The FCA extends to fraud-in-the-inducement.  Under this theory, FCA liability attaches "to each claim submitted to the government under a contract, when the contract or extension of the government benefit was originally obtained through false statements or fraudulent conduct."  *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 902

(9th Cir. 2017); *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th

Cir. 2006).  Under this theory, "claims for payment subsequently submitted under a contract

initially induced by fraud do not have to be false or fraudulent in and of themselves in order to

state a cause of action under the FCA."  *In re Baycol Prod. Litig.*, 732 F.3d 869, 876 (8th Cir.

2013).

24.    Federal courts, including the United States Supreme Court, have long recognized

that rigging bids under federally-funded contracts results in false and fraudulent payments to

contractors and accordingly creates liability under the FCA.  *U.S. ex rel. Marcus v. Hess*,

317 U.S. 537, 542-43 (1943).

### B.    The CARES Act and Paycheck Protection Program

25.    On March 27, 2020, Congress passed the CARES Act  (Pub. L. 116-136).

Through the CARES Act, Congress authorized emergency financial assistance to businesses

suffering economic consequences from the COVID-19 pandemic.  Among other things,

Congress established the Paycheck Protection Program (PPP), under which eligible small

businesses could obtain an SBA guaranteed loan.  Businesses were required to spend the loan

proceeds on employee compensation, rent, and other specified expenses.  Depending on their use

of the loan proceeds, eligible businesses could qualify for forgiveness of up to the full amount of

the loan.

26.    The SBA delegated authority to third-party lenders to underwrite and approve

PPP loans.  In order to obtain a PPP loan, a borrower (through its authorized representative)

signed and submitted a PPP loan application (SBA Form 2483) online through the lender's

application platform.

27.     The PPP loan application (SBA Form 2483) required the borrower (through its authorized representative) to acknowledge the PPP rules and make certain affirmative representations, authorizations, and certifications in order to be eligible to obtain the PPP loan. If an applicant falsely certified, or failed to certify, a representation contained in the application, the applicant would be ineligible to receive a PPP loan.

28.     One of the required representations was that "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."  Applicants engaged in illegal activity were not eligible to receive PPP loans.

29.     Once a borrower submitted its PPP loan application (SBA Form 2483) to a participating lender, the lender processed the PPP loan application.  If the lender approved the PPP loan application (SBA Form 2483), it funded the PPP loan using its own monies.

30.     Prior to closing an approved PPP loan, the lender had to submit a Lender's Application – Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA wherein the lender applied for a guarantee on the loan.  Therefore, if a PPP borrower lied on its PPP loan application (SBA Form 2483) regarding its eligibility, the PPP borrower's false certification caused the Lender to submit to the SBA, with respect to that PPP Loan, a Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484).

31.     While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA following approval of the Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484).

32.     PPP loan proceeds were required to be used by the borrower on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these

expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

33.    When a PPP loan was forgiven, the SBA used federal funds to reimburse the lender the amount of the PPP loan and interest.

**C.    Financial Institutions Reform, Recovery, and Enforcement Act of 1989**

34.    FIRREA provides that any person who violates, or who conspires to violate, enumerated statutes—including 15 U.S.C. § 645(a)—is liable for a civil penalty of up to $1 million per violation. 12 U.S.C. § 1833a(b)(1). For civil penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015, the maximum civil penalty has been adjusted to $2,449,575 per violation. 28 C.F.R. § 85.5.

35.    Under 15 U.S.C. § 645(a), "[w]hoever makes any statement knowing it to be false, . . . for the purpose of influencing in any way the action of the [SBA], or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both." 15 U.S.C. § 645(a). Materiality is not an element of 15 U.S.C. § 645(a). *See United States v. Condon*, 132 F.3d 653, 656 (11th Cir. 1998).

36.    Section 645(a) extends to false statements concerning a business's eligibility to receive set-aside contracts. *See United States v. Richards*, 393 Fed. App'x. 266 (6th Cir. 2010); *see also United States v. R.J. Zavoral & Sons, Inc.*, 894 F.Supp.2d 1118, 1127 (D. Minn. 2012) (denying motion to dismiss FIRREA claim involving SBA's Section 8(a) program).

37.    The predicate violations that can form the basis for liability under FIRREA also include: (a) knowingly or willfully making a materially false or fraudulent statement affecting a federally insured financial institution (18 U.S.C. § 1001); and (b) making a false statement on a

loan application to a financial institution, "the accounts of which are insured by the Federal Deposit Insurance Corporation" (18 U.S.C. § 1014).

38.     Section 1109(i) of the CARES Act provides that PPP loans are SBA loans for purposes of 15 U.S.C. § 645.

## VI.    FACTUAL ALLEGATIONS

### A.    The Bid Rigging and Territorial Allocation Scheme

39.     Since at least in or about February 2014, and up to and including in or about March 2023, the Defendants Bird Tire and Kris Bird defrauded the USFS and other federal and state agencies that procure firefighting equipment through the USFS and conspired to rig bids and allocate territories as to USFS contracts.

40.     The USFS procures the services of fuel tenders (commonly called "fuel trucks") from private vendors.  The USFS uses fuel trucks to support the firefighting efforts of federal and state agencies.  At a firefighting site or "fire camp," fuel trucks dispense fuel for a broad range of equipment, from electricity generators to all-terrain vehicles.

41.     The USFS also procures the services of water tenders (commonly called "water trucks") from private vendors.

42.     The USFS annually solicits competing bids from qualified fuel truck and water truck vendors.  The bidding deadline is roughly every February, March, or early April.

43.     Fuel truck bids have three elements most relevant here:  (A) the fuel truck's type; (B) the fuel truck's intended dispatch center; and (C) the fuel truck's daily rate, meaning the price in dollars per day that would be charged by the vendor if that truck was called out to a fire.

      a.  *Type*:  A fuel truck's type (Type 1, 2, or 3) denotes how much fuel it can hold.  Type 1 trucks hold more fuel than Type 2 or Type 3 trucks.

b. *Dispatch center*: A dispatch center generally serves a particular geographic area. For example, the Boise Interagency Dispatch Center generally serves the area around Boise, Idaho.

c. *Daily rate*: For a given dispatch center and type of fuel truck, vendors bid a daily rate. The rate is the price per day for the U.S. Forest Service or other Government agency to use the truck.

44. In other words, vendors bid to place a specific fuel truck at a specific dispatch center at a specific price, and the USFS awards contracts on this basis.

45. Dispatch centers at issue include centers in the USFS's Great Basin region, also known as Region 4. These centers are nicknamed according to places in Idaho and Nevada that roughly correspond to nearby cities or areas, such as "Boise," "Salmon," "Idaho Falls," "Payette" or "McCall," "Shoshone" or "South Central," and "Elko."

46. Each dispatch center has a dispatch priority list (DPL) for fuel trucks and water trucks. The DPL sequentially prioritizes which vendor the center contacts first when it needs equipment. If the Boise dispatch center needs a Type 2 fuel truck, for example, it will start by contacting the vendor who owns the first truck on Boise's Type 2 DPL. That truck then has the right of first refusal on fulfilling the resource order. The dispatch center will proceed down the DPL based on the needs of the dispatch center and availability of trucks higher on the DPL.

47. A truck makes its daily rate only if it fulfills resource orders. Thus, a truck's position on the DPL determines how many opportunities the truck's owner has to make money.

48. Daily rates largely determine the order on the DPL. For a given type of fuel truck in each dispatch center, the USFS usually lists the lowest price trucks first and the highest price trucks last. The cheaper it is to deploy a fuel truck per day, the higher its priority.

49. The USFS sets its DPLs once per year based on the bidding cycle conducted in or about each February, March, or early April.

COMPLAINT – 10

**Confidential Bids for Firefighting-Equipment Contracts**

50.    The USFS expects vendors' bids to be competitive and confidential.  The bids are competitive in that companies compete to have the lowest priced bid and to be higher priority on the DPL.  And the bids are confidential in that, before the USFS awards each year's contracts, competing vendors should not know each other's bids.

51.    For Bird Tire to be eligible to bid on contracts, the USFS and its contracts required Bird Tire to submit annual representations and certifications through the federal government's online System for Award Management (SAM.gov) or SAM's predecessors.  One of those certifications was a certificate of independent price determination.  Potential USFS contractors must submit a certificate of independent price determination before they can submit an offer for goods or services being solicited by the USFS.

52.    By signing the certificate of independent price determination, the signatory and those listed therein promise among other things, the following:

> (1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to-
>
> > (i) Those prices;
> >
> > (ii) The intention to submit an offer; or
> >
> > (iii) The methods or factors used to calculate the prices offered.
>
> (2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and
>
> (3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

COMPLAINT – 11

Federal Acquisition Regulation (FAR) § 52.203-2.

53.    Every year since at least 2014, Defendants Kris Bird and Bird Tire have attested or caused the attestation to a certificate of independent price determination.

54.    These certificates of independent price determination were materially false because, as described below, Defendants were engaged in a criminal bid rigging and territorial allocation conspiracy with Ike Tomlinson, Kaden Tomlinson, Jake Tanner, Mud Lake Oil and Fuel Source.  To further that conspiracy:

    a.  Kris Bird and Bird Tire routinely consulted, communicated, and reached agreements related to prices with Ike Tomlinson, Mud Lake Oil, Fuel Source, Kaden Tomlinson, and Jake Tanner for the purpose of restricting competition.

    b.  Kris Bird and Bird Tire also routinely shared prices with a competitor.

    c.  Ike Tomlinson, Mud Lake Oil, and Fuel Source attempted to induce a competitor not to submit an offer for the purpose of restricting competition.

55.    The USFS would not have awarded the contracts at issue in this case to Bird Tire had it known that Bird Tire and Kris Bird's certifications of independent price determination were false.

**The 2014 Takeover of Fuel Source from Its Founder**

56.    Until July 2014, Fuel Source's founder owned and led Fuel Source.

57.    Between in or about 2011 and fall 2013, Fuel Source operated about three fuel trucks.  Two belonged to Kris Bird.  Fuel Source's founder allowed Kris Bird to deploy his fuel trucks under Fuel Source's name until fall 2013.  However, before the 2014 procurement cycle, Kris Bird sought to bid his trucks under his own business, Bird Tire, as opposed to under Fuel Source.

58.     In addition to bidding fuel trucks under the Bird Tire entity, Kris Bird also offered to buy Fuel Source's founder's fuel truck.  Fuel Source's founder ultimately declined.  Indeed, at that time, Fuel Source's founder planned to expand Fuel Source's operations.  In January 2014, Fuel Source's founder spent significant funds on a second fuel truck in order to further his goal to expand Fuel Source.  In seeking to expand Fuel Source's fuel truck offerings, Fuel Source's then-owner essentially sought to increase competition with other fuel truck suppliers, like Kris Bird.

59.     Despite wanting to expand Fuel Source, when USFS finalized its contracts and dispatch priority lists for 2014, Fuel Source was third on the dispatch priority lists where it bid, behind Bird Tire and Mud Lake Oil.  Fuel Source's founder knew that, without higher priority on the DPLs, he could not afford to maintain his two fuel trucks.

60.     On or about June 7, 2014, Ike Tomlinson called Fuel Source's founder and offered to buy Fuel Source.  Immediately before calling Fuel Source's founder to make the offer, Ike Tomlinson called and spoke to Kris Bird for 50 minutes.

61.     In July 2014, given Fuel Source's low priority on the DPLs, Fuel Source's founder sold Fuel Source and its fuel trucks to Ike Tomlinson.  Thereafter, Fuel Source's founder no longer competed with Ike Tomlinson and Kris Bird.

62.     In May 2023, Kris Bird apologized to Fuel Source's founder for Ike Tomlinson's 2014 buyout of Fuel Source.

**Since at Least 2014, Kris Bird, Ike Tomlinson, and Other Individuals Have Texted and Called to Collude and Rig Bids on U.S. Forest Service Contracts**

63.     Since at least the 2014 procurement cycle, Ike Tomlinson and Kris Bird have communicated every year in the lead up to the bidding deadline for fuel trucks.

64.    Ike Tomlinson and Kris Bird texted each other before bidding deadlines in 2015, 2017 through 2020, and 2022 about either fuel trucks or water trucks.

65.    On March 4, 2015, for example, Ike Tomlinson and Kris Bird texted each other at length about bids on water trucks.  Below is an excerpt of their text exchange.  Ike Tomlinson's texts are prefaced "IT" and Kris Bird's "KB":

IT:    Got my water tenders in. Did not put any in salmon. FYI

KB:    You are the man!! If you want to put a couple here for a high amount I don't really care!

IT:    I think I might do that. What should I bid?

KB:    All find out what my bid was and then maybe we'll both raise them. 😊

IT:    K just let me know. Thanks

KB:    How high can we go on the water trucks?without being too high

IT:    Not sure. I'm 2000 on some and have been fine.

KB:    Then we know we can at least do 2000.  How many gallons are the trucks you want to put in salmon?

IT:    3499. Or 3999

IT:    I can do either

IT:    Want me to do the 3499 for 2000?

KB:    If you put the 3499 trucks at 2000. We should be good. I'll put mine at 1975. If that's good?

KB:    I guess you were thinking the same thing.

IT:    Great minds think alike. Scary

66.    In addition, in each year from 2014 through 2023, Ike Tomlinson and Kris Bird spoke over the phone in the several days leading up to the bidding deadline for fuel trucks.

67.    For example, in 2014, the bidding deadline for fuel trucks was February 14, 2014. On February 10, 12, and 13 of that year, Ike Tomlinson and Kris Bird called each other about three times and spoke for about 36 minutes.

COMPLAINT – 14

68.     As another example, in 2017, the bidding deadline for fuel trucks was April 3, 2017.  On March 13th, 27th, and 28th of that year, Ike Tomlinson and Kris Bird called each other about four times and spoke for a combined total of about 32 minutes.  Then, on March 31, 2017, Ike Tomlinson and Kris Bird texted each other the following regarding fuel truck bids:

> IT:     Boise. Ike $2549
>                 Chris $2560
>         Salmon. Ike $2600
>                 Chris $2590
>
> IT:     Sound ok?
>
> KB:     Looks great
>
> IT:     Deal🤑

69.     As another example, on March 5, 2019, Ike Tomlinson and Kris Bird texted each other the following:

> IT:     Fuel Tenders
>         Boise
>         1. Ike 2750.00
>         2. Kris 2800.00
>         Salmon
>         1. Kris 2750.00
>         2. Ike $2800
>
> IT:     Sound ok?
>
> KB:     Sounds good!! 👌

70.     On information and belief, Kaden Tomlinson, Jake Tanner and others have also texted and called with Kris Bird and Ike Tomlinson in order to collude and rig bids on U.S. Forest Service Contracts.

### In February 2020, Ike Tomlinson Asked Aaron Smith to Collude

71.     On February 6, 2020, Ike Tomlinson spoke with Aaron Smith—who was involved with a new competitor, Western Wildfire, LLC—at Aaron Smith's home.  A couple days before, Ike Tomlinson had been caught unlawfully entering the shop belonging to Aaron Smith, Spencer

Scott, and their company, Western Wildfire, LLC, in Idaho.  Aaron Smith recorded the conversation at Aaron Smith's home.

72.     In the recording, Ike Tomlinson admitted entering the shop because Western Wildfire, LLC had bought a fuel truck.

73.     Ike Tomlinson then proposed a deal.  Ike Tomlinson proposed that he, Aaron Smith, and Spencer Scott could collude on bids for contracts for COMMS trailers and fuel trucks.  A COMMS trailer is another kind of equipment that the U.S. Forest Service uses to fight wildfires.  The trailers contain communications systems, such as radios, that assist firefighting personnel.

74.     As to fuel trucks, Ike Tomlinson admitted his ongoing collusion with Kris Bird, and suggested that if Ike Tomlinson and Aaron Smith did not work together, Aaron Smith and Western Wildfire, LLC would "mak[e] no money."  Specifically, Ike Tomlinson said:  "As far as the fuel trucks go, I mean it's just like – you know how Kris Bird and I work together?  We basically talk once or twice a year and decide what we're going to do.  And – and we work it out.  Now, if I wasn't honest and didn't work it out with you guys that year, trust is gone, we're done.  You know what I mean?  We're back to battling but – and if we're back to battling, then we're both back to making no money.  You see what I'm saying?"

75.     Ike Tomlinson also proposed selling his communication trailers to Western Wildfire, LLC —and in exchange, Western Wildfire, LLC would not compete with Ike Tomlinson's fuel trucks.  Specifically, Ike Tomlinson said:  "Or another thing is that [Spencer Scott] and I talked about is maybe, you guys could buy all the trailers.  And – and we'll do the fuel trucks and have an agreement where we don't compete against each other."

76.     Aaron Smith rejected Ike Tomlinson's proposals.

77.     Aaron Smith also warned Ike Tomlinson that Ike Tomlinson's collusion with Kris Bird is illegal.  Aaron Smith said:  "But, just a heads up, what you and Kris do, back and forth knowing each other's prices – if they catch you doing that, it is illegal.  So you need to be careful."

### Ike Tomlinson and Kris Bird Continued to Collude

78.     In 2020, the bidding deadline for fuel trucks was March 23, 2020.  Like in earlier years, Ike Tomlinson and Kris Bird called and texted each other shortly before the deadline—and on the day of the deadline itself.

### In October 2020, Ike Tomlinson Sold His Companies to Kaden Tomlinson and Jake Tanner

79.     In October 2020, Ike Tomlinson and his wife sold Fuel Source, Mud Lake Oil, and two other entities to Kaden Tomlinson and Jake Tanner.  Kaden Tomlinson is Ike Tomlinson's son, and Jake Tanner is Ike Tomlinson's son-in-law.

80.     The four companies sold for a total purchase price of $8,000,000.  Under the sale agreement, Ike Tomlinson and his wife hold a promissory note that requires Kaden Tomlinson and Jake Tanner to pay the purchase price in monthly installments.

81.     After the transfer in ownership interests, Kaden Tomlinson and Jake Tanner each owned half of Fuel Source and Mud Lake Oil.

### Ike Tomlinson and Kris Bird Continued to Collude After the Sale

82.     Even after Kaden Tomlinson and Jake Tanner bought Fuel Source and Mud Lake Oil, Ike Tomlinson continued to work for Fuel Source and Mud Lake Oil.

83.     Even after Kaden Tomlinson and Jake Tanner bought Fuel Source and Mud Lake Oil, Ike Tomlinson and Kris Bird continued to communicate before each year's bidding deadline.

84.     In 2022, for example, the bidding deadline for fuel trucks was March 31. The morning of the deadline, Ike Tomlinson and Kris Bird texted each other the following:

IT:     Boise
        Type 2
        Ike $2849
        Kris $2900

        Salmon
        Type 2
        Kris $2450
        Ike  $2499
        [Company F] $2500 ??

        Type 3
        Your call
        I'd say $2700

        Idaho falls
        Type 2
        $ 2900

        Elko
        Type 3
        $2700

KB:     I put my type 2 in salmon at 2649.   Last year it was 2549.

KB:     I put Elko at 2800.
        Thanks

IT:     👍

85.     In March 2023, Kris Bird and Kaden Tomlinson shared fuel truck bid information.

a.   On March 20, 2023, Kris Bird texted Kaden Tomlinson the following:

FUEL TRUCK PLACEMENTS FOR 2023

| SALMON IDAHO | GMC TYPE 2 | 2500 | SMALL INTERNAT | TP 3 | 2150 |
| IDAHO FALLS | INTER TP 2 | 2500 | INTERNAT | TP 2 | 2500 |
| BOISE | INTER TP 2 | 2520 | | | |
| ELKO NV | FORD TP 3 | 2800 | | | |
| SHOSHONE | FREIGHT TP2 | 2520 | | | |

    b.   Kaden Tomlinson responded:



86.    In February 2023 and March 2023, the U.S. District Court for the District of Idaho authorized wiretaps of cellular phone lines belonging to Ike Tomlinson. As alleged in the subsequent criminal indictment of Ike Tomlinson and Kris Bird, the wiretaps resulted in evidence that Ike Tomlinson, Kris Bird and two co-conspirators colluded in connection with the 2023 bidding process. *See* **Attachment A** (Indictment, Case No. 1:23-cr-00326-AKB, ECF No. 2) at ¶¶ 48-58.

87.    Ike Tomlinson and Kris Bird were subsequently indicted on charges of Conspiracy to Commit Wire Fraud, Wire Fraud, and Conspiracy in Restraint of Trade: Bid Rigging and Territorial Allocation. *See* **Attachment A.**

**Conspiracy to Commit Wire Fraud**
**18 U.S.C. § 1349**

88.    As alleged in the Indictment, Ike Tomlinson, Kris Bird, and others engaged in a Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349, spanning from at least in or about February 2014, up to and including in or about March 2023, in the District of Idaho and elsewhere. *See* **Attachment A** at ¶¶ 59-62. Specifically:

    a.   Ike Tomlinson, Kris Bird, and others did knowingly and intentionally combine, conspire, confederate, and agree together and with each other, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

    b.   It was a part and object of the conspiracy that Ike Tomlinson, Kris Bird, and others, knowingly having participated in, devised, and intending to devise, a scheme, plan, and artifice to defraud, and to obtain money and property by

means of materially false and fraudulent pretenses, representations, and promises—to wit, a scheme to defraud the United States Forest Service, and other federal and state agencies that procure firefighting-equipment services through the U.S. Forest Service, to obtain firefighting-equipment contracts and contract funds—would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme, plan, and artifice, in violation of Title 18, United States Code, Section 1343.

c. To further the objects of the conspiracy and the scheme, plan, and artifice to defraud, Ike Tomlinson, Kris Bird, and others used the following manner and means, among others:

   i. submitting, and causing to be submitted, annual certificates of independent price determination which they then and there well knew were materially false, for the purpose of obtaining fuel truck and water truck contracts from the U.S. Forest Service;

   ii. participating in, coordinating, maintaining, and monitoring a bid-rigging and territorial-allocation conspiracy among co-conspirators;

   iii. coordinating bids for daily rates and dispatch centers for contracts on fuel trucks, water trucks, and communication trailers;

   iv. coordinating, among themselves, priority on dispatch priority lists;

   v. coordinating bids for fuel truck contracts in order to increase, decrease, and stabilize the daily rates of fuel trucks;

   vi. excluding and attempting to exclude competitors from the market—including, at times, refraining from bidding against each other with respect to a dispatch center, or bidding at a higher or lower daily rate with respect to a dispatch center—to obtain resource orders for fuel trucks and water trucks;

    vii.  engaging in conversations—through phone calls, text messages, and other means of communication—to align their bids, including the daily rates and the dispatch centers of fuel trucks and water trucks, and priority on dispatch priority lists;

   viii.  purchasing and selling fuel trucks and associated businesses to remove competition from the market;

    ix.  submitting, and causing to be submitted, to the U.S. Forest Service claims for payment at collusive and noncompetitive daily rates and receiving payments in response to those claims;

    x.  surveilling competitors and their equipment by, among other things, aerial surveillance, and unlawful entry onto premises;

    xi.  communicating with potential witnesses against them in the criminal case and related cases;

   xii.  employing measures to conceal their actions by, among other things, communicating with each other by cell phone and text message, and making materially false, fictitious, and fraudulent statements and representations to Special Agents of the Federal Bureau of Investigation (FBI).

    d.  All in violation of Title 18, United States Code, Section 1349.

89. On information and belief, Kaden Tomlinson and Jake Tanner knowingly and actively participated in the alleged wire fraud conspiracy.

**Wire Fraud**
**18 U.S.C. §§ 1343 and 2(a)**

90. As alleged in the Indictment, from at least in or about February 2014, up to and including in or about March 2023, in the District of Idaho and elsewhere, Ike Tomlinson and Kris Bird knowingly participated in, devised, intended to devise, a scheme, plan, and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises; to wit—a scheme to defraud the United States Forest Service

(USFS), and other federal and state agencies that procure firefighting-equipment services through the USFS, to obtain firefighting-equipment contracts and contract funds. *Id.* ¶¶ 63-67.

91.     On at least five occasions, in the District of Idaho and elsewhere, Ike Tomlinson and Kris Bird did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, and sounds for the purpose of executing such scheme, plan, and artifice to defraud; to wit—payments made from United States departments and agencies to the defendants, described below, and aided and abetted the same, each transmission constituting a separate count, violation of Title 18, United States Code, Sections 1343 and 2(a). *Id.*

### Conspiracy in Restraint of Trade: Bid Rigging and Territorial Allocation
### 15 U.S.C. § 1

92.     As alleged in the indictment, from at least in or about February 2014, up to and including in or about March 2023, in the District of Idaho and elsewhere, Ike Tomlinson, Kris Bird, and others knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by rigging bids and allocating territories for fuel truck contracts with the United States Forest Service. *Id.* ¶¶ 68-72.

93.     The bid-rigging and territorial allocation conspiracy engaged in by Ike Tomlinson, Kris Bird, and others was a *per se* unlawful, and thus an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

94.     For the purpose of forming and carrying out this combination and conspiracy, Ike Tomlinson, Kris Bird, and others did those things that they combined and conspired to do, including, among other things:

    a.     engaging in conversations—through phone calls, text messages, and other
           means of communication—to align their bids, including the daily rates and
           the dispatch centers of fuel trucks;

b.      participating in conversations and communications for the purpose of reaffirming, maintaining, monitoring, and enforcing adherence to the agreement to rig bids and allocate territories;

c.      discussing and agreeing to suppress and eliminate competition among themselves for the U.S. Forest Service's fuel truck contracts by coordinating their bids—including, at times, by refraining from bidding against each other with respect to a dispatch center, or deliberately bidding at a higher or lower daily rate with respect to a dispatch center;

d.      discussing and agreeing to allocate among themselves U.S. Forest Service dispatch centers and priority on dispatch priority lists—including, among others, Great Basin dispatch region (Region 4) centers in (1) Boise, Idaho; (2) Salmon, Idaho; (3) Shoshone, Idaho; (4) Idaho Falls, Idaho; and (5) Elko, Nevada.

e.      coordinating their bids on U.S. Forest Service's fuel truck contracts in order to increase, decrease, and stabilize the daily rates of fuel trucks;

f.      coordinating their bids on U.S. Forest Service's fuel truck contracts in order to "squeeze," "drown," "punch," "low ball," deprioritize on the dispatch priority lists, and otherwise exclude and attempt to exclude from the market, competitors;

g.      selling and accepting payment for fuel trucks at collusive and noncompetitive daily rates;

h.      employing measures to conceal their actions by, among other things, communicating with each other by cell phone and text message; knowingly submitting or causing to be submitted false annual certificates of independent price determination; and making materially false, fictitious, and fraudulent statements and representations to Special Agents of the FBI.

*See* **Attachment A** *at* ¶ 71.

95.      The business activities of Ike Tomlinson, Kris Bird, and others that are the subject of the Indictment were within the flow of, and substantially affected, interstate trade and commerce.  For example, Ike Tomlinson, Kris Bird, and others engaged in activities including, but not limited to:  (a) subject to the conspiracy, conspiring to enter into fuel truck contracts with

the U.S. Forest Service, a federal agency with its headquarters in Washington, D.C.; (b) receiving

payments related to those fuel truck contracts from the U.S. Forest Service's federal funds;

(c) causing the transmission of substantial sums of money across state lines in connection with

those contracts; and (d) operating in multiple states, including Idaho, Nevada, and elsewhere.  All

in violation of Title 15, United States Code, Section 1.

96.     On information and belief, Kaden Tomlinson and Jake Tanner knowingly and

actively participated in the alleged conspiracy, including by: (a) knowingly making or causing to

be made false SAM Certifications; and (b) discussing and sharing bid information with Kris

Bird.

**Ike Tomlinson Pleads Guilty to Criminal Charges**

97.     On April 8, 2024, the United States filed a superseding information against just

Ike Tomlinson charging him with Count 1 - Conspiracy in restraint of trade: bid rigging and

territorial allocation, in violation of 15 U.S.C. § 1, and Count 2 - Conspiracy to monopolize trade

in violation of 15 U.S.C. § 2.  *See* **Attachment B (Superseding Tomlinson Information).**

98.     On April 8, 2024, Ike Tomlinson pled guilty to Counts 1 and 2 in the superseding

information.  Specifically, Tomlinson pled guilty to Conspiracy in restraint of trade: Bid Rigging

and territorial allocation (Count 1), and Conspiracy to monopolize trade (Count 2).  *United States

v. Tomlinson*, 23-cr-00326-AKB, ECF No. 36 (April 8, 2024) (hereinafter, Tomlinson Plea

Agreement).

99.     In his signed plea agreement, Ike Tomlinson admitted to at least the following

facts:

a.    Tomlinson and his companies, including Mud Lake Oil and Fuel Source,

contracted to provide wildfire fuel truck services for dispatch centers of the

U.S. Forest Service's Great Basin wildfire dispatch region (Region 4) (the relevant market). *See* Tomlinson Plea Agreement at 4.

b. From at least as early as March 2015 until in or about March 2023, in the District of Idaho and elsewhere, Ike Tomlinson knowingly entered into and engaged in a combination and conspiracy to eliminate competition between Tomlinson and Kris Bird, and to suppress competition, by rigging bids and allocating territories in the relevant market (the bid rigging and territorial allocation conspiracy). And from at least as early as February 2020 until in or about March 2023, in the District of Idaho and elsewhere, Tomlinson and Kris Bird conspired to work together to de-prioritize competitors on dispatch priority lists (the conspiracy to monopolize). *See* Tomlinson Plea Agreement at 4-5.

c. The purpose of the conspiracy to monopolize was for Tomlinson and Kris Bird to gain and maintain the power to control prices and exclude competitors in the relevant market. *See* Tomlinson Plea Agreement at 5.

d. Starting at least as early as March 2015, Tomlinson and Kris Bird conspired to rig bids for wildfire fuel truck services for the Boise and Salmon dispatch centers. Specifically, Tomlinson and Bird agreed on the bids (also known as "quotes") they would submit to the U.S. Forest Service in order to (1) avoid bidding against each other with respect to certain dispatch centers or (2) deliberately bid at a higher or lower daily rate to determine who would win priority on a dispatch center's priority list, which determined who would first receive business from the U.S. Forest Service (and other federal agencies) in

the event of a wildfire in a specific geographical area.  By March 2020, the bid-rigging and territorial allocation conspiracy had expanded to include the Idaho Falls, Elko, and Central Nevada dispatch centers, and by March 2023, the Payette and Shoshone dispatch centers.  *See* Tomlinson Plea Agreement at 5-6.

e.  Starting at least as early as February 2020, Tomlinson and Kris Bird also conspired to monopolize the relevant market.  *See* Tomlinson Plea Agreement at 6.  For example, in 2023, Tomlinson and Bird and another individual participated in conversations in which they agreed to rig bids for the purpose of de-prioritizing two competing fuel truck vendors on dispatch priority lists and thus excluding them from the market.  *See* Tomlinson Plea Agreement at 7.  For example, on March 17, 2023, Tomlinson, Kris Bird and one additional individual participated in a phone call in which they agreed on bid prices intended to de-prioritize a competing fuel truck vendor.  On the call, Tomlinson, Bird and one other individual agreed that Kris Bird would put a Type 3 truck in Idaho Falls, as Bird said, "just in case [the competing vendor] does" with the goal of trying to "squeeze him out."  The agreement therefore was that Tomlinson and Bird would try to exclude the competing vendor from the market.  Near the end of this phone call, Kris Bird referred to the bid prices the participants had agreed upon.  Bird said, "before I send this off, I'll send you a copy, just so that we, we didn't screw up and . . . we'll double check and make sure it looks good."  *See* Tomlinson Plea Agreement at 7.

COMPLAINT – 26

     f.     To carry out the conspiracies, Tomlinson and Kris Bird spoke over the phone to agree on their bids.  Their phone calls in furtherance of the conspiracies defined above took place each year—both before the relevant bidding deadlines and during the fire season—from at least in or about March 2015 until in or about March 2023.  *See* Tomlinson Plea Agreement at 7.

### Ike Tomlinson, Kaden Tomlinson, Jake Tanner, Mud Lake Oil, and Fuel Source Enter into a Civil Settlement Agreement with the United States

100.    On July 10, 2024, Ike Tomlinson, Kaden Tomlinson, Jake Tanner, Baylee Tanner, Mud Lake Oil, and Fuel Source entered into a Civil Settlement Agreement with the United States.  Therein the United States alleged, among other things, that it had certain civil claims against those individuals and entities, including that Mud Lake Oil, Inc., Fuel Source, LLC, and at least one of the Mud Lake Oil Individuals obtained government contracts through bid-rigging and the submission of false System for Award Management (SAM) Certifications, including false SAM Certifications of independent price determination.

101.    As part of the civil Settlement Agreement, Ike Tomlinson, Jake Tanner, Baylee Tanner, Mud Lake Oil, Inc., and Fuel Source, LLC agreed to pay to the United States the total sum of $1,100,000, in exchange for a release of the potential civil claims against them.

### Presentment of False Claims by Kris Bird and Bird Tire

102.    As a result of the false SAM certifications, bid rigging, and other fraudulent conduct described above, Bird Tire fraudulently obtained contracts to supply fuel trucks to the United States.  Bird Tire would not have been awarded the contracts had it told the truth and informed the government that its independent price determination certifications were false.

103.    Because all invoices submitted under fraudulently obtained contracts are false or fraudulent claims within the meaning of 31 U.S.C. § 3729, each of the invoices submitted under

these fraudulently obtained fuel truck contracts was a false or fraudulent claim within the meaning of 31 U.S.C. § 3729.

104.    Between July 2014 and August 2023, Kris Bird and Bird Tire presented, or caused to be presented, at least 29 false or fraudulent invoices seeking payment for Bird Tire fuel trucks under fraudulently obtained contracts.

105.    Each of these false invoices constitutes a separate claim under the FCA.

106.    Under the FCA, the mandatory minimum civil penalty for each of these false or fraudulent fuel truck claims submitted before November 2, 2015 is $5,500, and the maximum civil penalty for each of these false or fraudulent fuel truck claims is $11,000.

107.    Under the FCA, the mandatory minimum civil penalty for each of these false or fraudulent fuel truck claims submitted after November 2, 2015 is $13,946, and the maximum civil penalty for each of these false or fraudulent fuel truck claims is $27,894.  *See* 28 C.F.R. § 85.5.

### B.    PPP Loan Fraud

108.    On or about April 28, 2020, Kris Bird, as the President and authorized representative of Bird Tire, submitted a PPP Loan Application to WaFd Bank.  WaFd Bank is a DBA (Doing Business As) of Washington Federal Bank.  The accounts of WaFd Bank are insured by the Federal Deposit Insurance Corporation.

109.    The Bird Tire PPP Application submitted by Kris Bird included the representation that "[t]he Applicant is not engaged in any activity that is illegal under federal, state or local law."  This representation was knowingly false because Kris Bird and Bird Tire knew they were engaged in illegal activity, including the above described conspiracy to commit wire fraud, wire fraud, and a conspiracy in restraint of trade.

110.    Based, in part, on this false representation, WaFd Bank approved and funded a $90,593.24 PPP loan to Bird Tire.  WaFd Bank would not have approved and funded the PPP loan to Bird Tire if it had known the truth, *i.e.*, that Kris Bird and Bird Tire were engaged in the illegal activity described above and elsewhere in this complaint.

111.    WaFd Bank subsequently submitted a Lender Application Form – Paycheck Protection Program Loan Guaranty (SBA Form 2484) to the SBA, requesting that the SBA guarantee the Bird Tire PPP loan.  The SBA approved the application and guaranteed the Bird Tire PPP loan.  The SBA would not have approved the application and guaranteed the Bird Tire PPP loan if it had known the truth, *i.e.*, that Kris Bird and Bird Tire were engaged in the illegal activity described above and elsewhere in this complaint.

112.    On or about December 24, 2020, Kris Bird as the CEO and authorized representative of Bird Tire submitted a PPP Loan Forgiveness Application.  The application was approved, and the SBA forgave the Bird Tire PPP loan.  The SBA would not have approved the application and forgiven the Bird PPP loan if it had known the truth, *i.e.*, that Kris Bird and Bird Tire were engaged in the illegal activity described above.

## VIII.  CAUSES OF ACTION

<u>Count I:  False or Fraudulent Claims</u>
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(A))**
**Fraud in the Inducement-Bid Rigging Against Defendants Kris Bird and Bird Tire**

113.    The United States re-alleges and incorporates in this Count I all preceding paragraphs of this Complaint.

114.    Through the acts described above, the Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).  Specifically, Defendants knowingly presented

or caused to be presented at least 29 false or fraudulent claims for payment under fuel truck contracts that the Defendants obtained by fraud.

115.    The United States would not have paid these claims if it had known that the Defendants obtained the underlying fuel truck contracts by fraud.

116.    Each false or fraudulent fuel truck claim that the Defendants presented, or caused to be presented, constitutes a separate violation of the FCA.

117.    By virtue of the false or fraudulent claims presented, or caused to be presented, by the Defendants, the United States sustained damages in an amount to be determined at trial, and, therefore, is entitled to treble damages under the FCA in an amount to be proven at trial, plus a civil penalty for each claim.

**Count II:  False Records and Statements**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**
**False SAM Certifications and Fuel Truck Claims Against Kris Bird and Bird Tire**

118.    The United States re-alleges and incorporates in this Count II all preceding paragraphs of this Complaint.

119.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B), including, but not limited to, false SAM Certifications and false fuel truck claims.

120.    Defendants knowingly made, used, or caused to be made or used these false records and statements to get false or fraudulent fuel truck claims paid by the United States.

121.    These false records and statements were material because the United States would not have contracted with Bird Tire, or paid claims submitted by Bird Tire, had it known of the Defendants' fraudulent conduct.

122.    Each false or fraudulent SAM Certification and fuel truck claim that the Defendants made, used, or caused to be made or used, constitutes a separate violation of the FCA.

123.    By virtue of the false records and statements that Defendants made, used, or caused to be made or used to get false fuel truck claims paid, the United States sustained damages in an amount to be determined at trial, and, therefore, is entitled to treble damages under the FCA in an amount to be proven at trial, plus a civil penalty for each false record or statement.

### Count III:  False Claims Act Conspiracy
**(31 U.S.C. § 3729(a)(1)(C))**
**Conspiracy to Violate the FCA Against Defendants Kris Bird and Bird Tire**

124.    The United States re-alleges and incorporates in this Count III all preceding paragraphs of this Complaint.

125.    Through the acts described above, the Defendants conspired with at least Ike Tomlinson, Kaden Tomlinson, and Jake Tanner to violate both 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

126.    At least 183 false claims were submitted to the government by Ike Tomlinson, Kaden Tomlinson, Jake Tanner, Kris Bird, Mud Lake Oil, Fuel Source, and Bird Tire as part of and in furtherance of the conspiracy described in this Complaint.

127.    The United States has sustained damages as a result of this conspiracy in an amount to be determined at trial.  The United States is also entitled to civil penalties for each false claim submitted to the government as part of and/or resulting from the conspiracy.

## Count IV:  False or Fraudulent Claims
## 31 U.S.C. § 3729(a)(1)(A)
### PPP Loan Fraud Against Bird Tire and Kris Bird

128.    The United States re-alleges and incorporates in this Count IV all preceding paragraphs of this Complaint.

129.    Through the acts described above, Bird Tire and Kris Bird knowingly presented, or caused to be presented, to an officer or employee of the United States, false or fraudulent claims for payment or approval in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Bird Tire and Kris Bird presented, or caused to be presented, a false or fraudulent PPP loan application (SBA Form 2483), Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484), and PPP Loan Forgiveness Application (SBA FORM 3508EZ).

130.    The United States would not have guaranteed or forgiven the Bird Tire PPP Loan had it known the truth, *i.e.*, that Bird Tire and Kris Bird obtained the Bird Tire PPP Loan by falsely and fraudulently certifying that Bird Tire was not engaged in illegal activity.  Nor would Defendants' lender, WaFed Bank, have approved, funded, or issued the loan had it known the truth about Defendants' illegal activities.

131.    Because of Bird Tire and Kris Bird's fraudulent acts, the United States was damaged for the full amount of the Bird Tire PPP loan, plus associated costs, fees, and interest, and therefore the United States is entitled to treble damages of at least $271,779.72, plus a civil penalty for each false claim.

<u>**Count V:  False Records and Statements**</u>
<u>**31 U.S.C. § 3729(a)(1)(B)**</u>
**PPP Loan Fraud Against Bird Tire and Kris Bird**

132.    The United States re-alleges and incorporates in this Count V all preceding paragraphs of this Complaint.

133.    Through the acts described above, Bird Tire and Kris Bird made, used, or caused to be made or used false records and statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B), including a false PPP Loan Application (SBA Form 2483), Lender's Application-Paycheck Protection Program Loan Guaranty (SBA Form 2484), and PPP Loan Forgiveness Application (SBA FORM 3508EZ).

134.    Each of these false records or statements is a separate violation of the FCA.

135.    Bird Tire and Kris Bird knowingly made, used, or caused to be made or used these false records or statements to obtain a PPP loan and subsequently have that loan forgiven by the SBA.

136.    These false records and statements are material because the United States would not have guaranteed or forgiven the Bird Tire PPP Loan had it known that Bird Tire was not eligible to receive a PPP loan because it was engaged in the illegal activity described above.

137.    By virtue of the false PPP Loan Application (SBA Form 2483), Lender's Application - Paycheck Protection Program Loan Guaranty (SBA Form 2484), and PPP Loan Forgiveness Application (SBA FORM 3508EZ) that Kris Bird and Bird Tire made, used, or caused to be made or used to obtain the Bird Tire PPP Loan and forgiveness of that loan, the United States sustained damages in the full amount of the Bird Tire PPP loan plus associated costs, fees, and interest, and, therefore, is entitled to treble damages of at least $271,779.72, plus a civil penalty for each false record or statement.

**Count VI:  FIRREA**
**(12 U.S.C. §§ 1833a(a), (c)(3))**
**PPP Loan Fraud Against Bird Tire and Kris Bird**

138.    The United States re-alleges and incorporates in this Count VI all preceding

paragraphs of this Complaint.

139.    Through the acts described above, Bird Tire and Kris Bird:  (a) knowingly made

false statements for purposes of influencing the action of the SBA related to the Bird Tire PPP

loan and obtaining money in violation 15 U.S.C. § 645(a); (b) knowingly and willfully made a

materially false or fraudulent statement affecting a federally insured financial institution in

violation of 18 U.S.C. § 1001; and (c) made a false statement on a loan application to a financial

institution the accounts of which are insured by the Federal Deposit Insurance Corporation in

violation of 18 U.S.C. § 1014.

140.    Accordingly, under 12 U.S.C. § 1833a(c) and 28 C.F.R. § 85.3(a)(6), Bird Tire

and Kris Bird are liable for civil penalties under FIRREA.

**Count VII:  Fraud**

141.    The United States re-alleges and incorporates in this Count VII all preceding

paragraphs of this Complaint.

142.    Through the actions described above, Defendants Bird Tire and Kris Bird engaged

in conduct designed to deceive the USFS and SBA as to Bird Tire's eligibility for government

contracts and PPP loans.

143.    Defendants Bird Tire and Kris Bird knowingly and intentionally made false and

fraudulent independent price determination certifications to the USFS to obtain government

contracts.  These false and fraudulent independent price determination certifications were

material to the government's decision to contract with Bird Tire.

144.     Defendants Bird Tire and Kris Bird knowingly and intentionally made false and fraudulent statements to lenders and the SBA to obtain SBA-guaranteed PPP loans and forgiveness thereof.  Specifically, they certified that Bird Tire was not engaged in illegal activity. These false statements were material to the SBA's decision to guarantee and subsequently forgive the Bird Tire PPP loan.

145.     Defendants Bird Tire and Kris Bird intended that the USFS would enter contracts with Bird Tire based on their false and fraudulent certifications of independent price determination.

146.     Defendants Bird Tire and Kris Bird intended that the SBA would guarantee the Bird Tire PPP loan(s) based on their false and fraudulent statements that Bird Tire was not engaged in illegal activity.

147.     The USFS, BLM, NPS, and USFWS were not aware when they entered into contracts with Bird Tire that Defendants' certifications of independent price determination were false.

148.     The SBA was not aware when it approved the Bird Tire PPP loan that Defendants Bird Tire and Kris Bird's statements that they were not engaged in illegal activity were false.

149.     The USFS reasonably relied upon Defendants' false and fraudulent statements and omissions regarding independent price determinations when they entered contracts with Bird Tire.

150.     The SBA reasonably relied upon Defendants' Bird Tire and Kris Bird's fraudulent statements and omissions that Bird Tire was not engaged in illegal activity when it guaranteed and subsequently forgave the Bird Tire PPP loans.

151.    The USFS was entitled to rely upon Defendants Bird Tire and Kris Bird's false and fraudulent statements and omissions regarding independent price determination.

152.    The SBA was entitled to rely upon Defendants Bird Tire and Kris Bird's fraudulent statements that Bird Tire was not engaged in illegal activity when it guaranteed and subsequently forgave the Bird Tire PPP loan.

153.    As a result of Bird Tire and Kris Bird's false and fraudulent statements and material omissions, the United States was damaged and is entitled to recover both damages and punitive damages.

### Count VIII:  Unjust Enrichment

154.    The United States re-alleges and incorporates in this Count VII all preceding paragraphs of this Complaint.

155.    By reason of the conduct described above and their violations of federal law, Bird Tire and Kris Bird were unjustly enriched and are liable to account for and pay such amounts, which are to be determined at trial, to the United States.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, prays that this Court enter judgment in its favor and against Defendants, jointly and severally, granting the United States the following:

(a) Under Counts I to V (False Claims Act), the amount of the United States' damages, trebled as required by law, plus such civil penalties as are required by law;

(b) Under Count VI (FIRREA), civil penalties in the amount of at least $1,000,000 and to be determined as required by law;

(c)  Under Count VII (Fraud), the amount of the United States' damages and punitive

damages;

(d)  Under Count VIII (Unjust Enrichment), an accounting and the amount by which

Defendants were unjustly enriched, plus interest, costs, and expenses;

(e)  Such other relief as this Court may deem just and proper, together with interest and

costs of this action.

Dated this 27th day of January, 2025.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:


_____*/s/ Robert B. Firpo*_____
ROBERT B. FIRPO
Assistant United States Attorney